Molly E. Danahy
Andres Haladay
Caitlin M. Cocilova
Jonathan M. Molony
Upper Seven Law
P.O. Box 31
Helena, MT 59624
(406) 998-6067
molly@uppersevenlaw.com
andres@uppersevenlaw.com
caitlin@uppersevenlaw.com
johnny@uppersevenlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**

JESUS VERDE HERNANDEZ, JOSE ALFREDO MARTINEZ ALANIZ, LIZET HOLGUÍN VEGA, FREDY ARNULFO DIAZ COREAS, individually and on behalf of others similarly situated,

*Plaintiffs,*

v.

DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, IMMIGRATION & CUSTOMS ENFORCEMENT, DAVID VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration & Customs Enforcement, CUSTOMS & BORDER PROTECTION, RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs & Border Protection, ZACHARY CROSSON, Havre Chief Patrol Agent, U.S. Customs & Border Patrol, DEPARTMENT OF JUSTICE, TODD BLANCHE, in his official capacity as Attorney General of the United States,

*Defendants.*

Civil Action No. CV-26-301-GF-JTJ

**CLASS ACTION COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND VACATUR RELIEF**

## INTRODUCTION

1. Under the United States Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE") agents operating in Montana have a well-established policy and practice of arresting first, justifying later. In the interim, DHS agents coerce unlawfully arrested individuals to give up their due process rights—including meritorious habeas relief. This policy and practice violates the United States Constitution and federal law.

2. By statute, warrantless arrests for civil immigration violations are strictly limited, and require, at a minimum, (1) probable cause that the person being arrested "is in the United States in violation" of immigration laws, and (2) probable cause that the person being arrested "is likely to escape before a warrant can be obtained for [their] arrest." 8 U.S.C. § 1357(a)(2); *see Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable [noncitizen] to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent.").

3. DHS agents are ignoring the law's clear requirement to make these probable cause determinations, including by failing to make and document an individualized flight risk assessment before making a warrantless arrest.

4. After making a warrantless arrest, DHS agents must make a custody determination and issue an administrative warrant and Notice to Appear ("NTA") within 48 hours, absent exigent circumstances. 8 C.F.R. § 287.3(d).

5. DHS agents are also routinely ignoring these obligations.

6. Finally, the law requires DHS agents to make an individualized custody determination regarding the arrestee and to release individuals who are neither a danger to the community nor a flight risk. 8 C.F.R. § 236.1(c)(8); *see Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (noting that the law provides that arrestees "detained under § 1226(a) receive bond hearings at the outset of detention" (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1))).

7. DHS agents are refusing to do this, in violation of their oaths to follow the law.

8. Instead, DHS agents initially detain arrested individuals in hold rooms and CBP facilities that are not equipped for long-term habitation. DHS agents force these arrested individuals to sleep on the floor, deprive them of adequate food and hygiene, and prevent them from accessing legal counsel. Alternatively, DHS agents remand custody of detained individuals to Montana county jails, where those individuals may be strip searched, forced to sleep on the floor, housed alongside persons charged with or convicted of criminal violations, and generally subjected to overcrowded, unsafe, and severely restrictive conditions.

9. While subjecting detained individuals to these conditions, DHS agents also pressure them to "voluntarily" remove themselves from the United States, misrepresenting the civil immigration process and the ability to access counsel, providing false information, threatening individuals with indefinite incarceration, and telling them they have no hope. Officers may wake a person up repeatedly throughout the night, asking them again and again to voluntarily deport or threatening to sign documents on an individual's behalf.

10. Defendants have designed these intentional and unlawful policy and practices to coerce detained individuals to give up their basic due process rights.

11. Named Plaintiffs Jesus Verde Hernandez, Jose Alfredo Martinez Alaniz, Lizet Holguín Vega, and Fredy Arnulfo Diaz Coreas (hereafter "Plaintiffs," "Jesus," "Jose," "Lizet," or "Fredy"), on behalf of themselves and those similarly situated, ask this Court for declaratory relief, injunctive relief, and vacatur on behalf of a class of individuals who have been and will be arrested in Montana for alleged immigration violations, without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk. Plaintiffs also seek to represent a subclass of individuals who are detained for more than 48 hours without receiving a custody determination, and without being served a warrant or an NTA.

12. Plaintiffs' experiences are representative of other unlawfully arrested individuals. DHS agents arrested Plaintiffs without a warrant, and without probable cause that they were likely to flee before a warrant could be obtained. If DHS agents had followed the law during and after

these immigration stops, they would have determined that Plaintiffs did not present a likelihood of escape justifying warrantless detention. And DHS detained Jose for more than 48 hours without making a custody determination or issuing a warrant or NTA.

13. Plaintiffs bring this challenge on behalf of themselves, and individuals similarly situated to put an end to Defendants' policy and practice of unlawful warrantless arrests and detentions in Montana.

14. Plaintiffs also seek relief under the Administrative Procedure Act ("APA") to vacate and set aside DHS's unlawful arrest policy. 5 U.S.C. §§ 702, 706(2).

## JURISDICTION

15. Jurisdiction is proper and relief is available under 28 U.S.C. § 1331 because Plaintiffs allege violations of the U.S. Constitution, Immigration and Nationality Act ("INA"), and the APA.

16. This Court has the authority to grant the relief requested by Plaintiffs under the APA, 5 U.S.C. § 701 *et seq.*; Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable authority.

## VENUE

17. Venue is proper in this District under 28 U.S.C. § 1391 because DHS, CBP, and ICE all operate in this district, including having multiple field offices within the District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

18. Plaintiff Jesus Verde Hernandez is a resident of Worden, Montana, and has resided in the United States since 2011. DHS arrested Jesus without probable cause or issuance of a warrant on July 30, 2026, and detained him until August 8, 2026. Defendants only released Jesus after an order from this Court granting Jesus's habeas relief.

19. Plaintiff Lizet Holguín Vega is a resident of Billings, Montana, and has resided in the United States since 2016. DHS arrested Lizet on September 3, 2026.

20. Plaintiff Fredy Arnulfo Diaz Coreas has resided in the United States for approximately 11 years. DHS arrested Fredy on September 2, 2026. Fredy is currently detained by DHS in Havre, Montana.

21. Plaintiff Jose Alfredo Martinez Alaniz has lived in the United States for approximately five years. DHS arrested Jose on August 3, 2026.

22. Defendant Department of Homeland Security is the federal agency responsible for implementing and enforcing the INA, including the detention of noncitizens.

23. Defendant Markwayne Mullin is the Secretary of DHS. He is named in his official capacity.

24. Defendant Immigration and Customs Enforcement is a division within DHS that is responsible for immigration enforcement, including apprehending and detaining individuals charged with being removable from the United States.

25. Defendant David Venturella is the Senior Official Performing the Duties of the Director of ICE within DHS. He is responsible for ICE's policies, practices, and procedures, including those relating to the arrest and detention of immigrants pending removal procedures. He is named in his official capacity.

26. Defendant Customs and Border Patrol is a division within DHS that is responsible for managing and controlling the border, including through the arrest and detention of immigrants charged with being removable from the United States.

27. Defendant Rodney Scott is the Commissioner for CBP. He is responsible for CBP's policies, practices, and procedures, including those relating to the arrest and detention of immigrants pending removal proceedings. He is named in his official capacity.

28. Defendant Zachary Crosson is the Chief Patrol Agent for CBP's Havre Sector, which oversees CBP field operations, including arrests, in the District of Montana. The Havre Sector includes 456 miles of border area between Montana and Canada, Wyoming, Colorado and Utah, and part of Idaho. The Havre Sector is headquartered in Havre, Montana. Defendant Crosson is named in his official capacity.

29. Defendant the Department of Justice is a federal agency that houses the Executive Office for Immigration Review ("EOIR") and the immigration court system EOIR administers.

30. Defendant Todd Blanche is the Attorney General of the United States and Head of the U.S. Department of Justice. In that capacity, he oversees the EOIR and the immigration court system EOIR administers. He is ultimately responsible for EOIR's operation. He is named in his official capacity.

## LEGAL BACKGROUND

31. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.

32. "Except at the border and its functional equivalents," immigration agents may stop individuals in public only after identifying "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" of a violation of immigration law. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *Benitez-Mendez v. I.N.S.*, 752 F.2d 1309, 1311 (9th Cir. 1983), *amended*, 760 F.2d 907 (9th Cir. 1983); *see also* 8 C.F.R. § 287.8(b)(2) (allowing officer to "briefly detain" a noncitizen for questioning if the officer "has a reasonable suspicion, based on specific articulable facts" that the noncitizen is engaged in an offense or is unlawfully in the United States).

33. Reasonable suspicion for an immigration stop cannot be based "on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citation omitted). Rather, reasonable suspicion must be

"particularized and objective." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An officer must have reasonable suspicion as to "the particular person being stopped." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc).

34. Information obtained from lawful questioning "may provide the basis for a subsequent arrest." 8 C.F.R. § 287.8(b)(3). But immigration officers may only arrest an individual without a warrant in limited circumstances. *See Arizona*, 567 U.S. at 407–08 (noting strong Congressional preference, as expressed in INA, for immigration arrests to be based on warrants); *see also Mendoza v. I.N.S.*, 559 F. Supp. 842, 851 (W.D. Tex. 1982) ("The Court holds that § 1357 does not confer unlimited authority to stop and question a person just because the person is believed to be an alien. [Immigration] agents have the right under § 1357 to approach a person believed to be an alien and ask questions, so long as the agent does not restrain the person and the person stopped is free to walk away." (emphasis added)).

35. The INA permits warrantless arrests only if an immigration officer has reason to believe that a person (1) is in the United States in violation of the immigration laws and (2) "is likely to escape before a

warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)–(ii). An officer "has reason to believe" when they have the equivalent of "the constitutional requirement of probable cause." *Tejeda-Mata v. INS,* 626 F.2d 721, 725 (9th Cir. 1980); *contra Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 44 (D.D.C. 2025) (noting that Defendants "have repeatedly emphasized an abandonment of the probable cause standard"); *M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1173, 1181 (D. Or. 2026) (collecting statements including a report of White House deputy chief of staff Stephen Miller's order to federal officers to "just go out there and arrest illegal aliens"); *Escobar Molina*, 811 F. Supp. 3d at 44 (citing, among other agency representations, former Chief Border Patrol Officer Gregory Bovino's statement that "We need reasonable suspicion to make an immigration arrest . . . You notice I did not say probable cause, nor did I say I need a warrant. We need reasonable suspicion of illegal alienage that's well grounded within the United States immigration law").

36. An individualized flight risk determination does not simply consider "whether [an individual] was likely to leave the [scene] before [immigration] officers could obtain a warrant, but rather whether it was

likely that [immigration] officers would be able to locate [the individual] after obtaining a warrant to arrest him." *See Walther Ademir A.S. v. Blanche*, No. 26-cv-2804, 2026 WL 1734906, at *3 (D. Minn. June 16, 2026) (cleaned up) (collecting cases).

37. Arrestees may properly invoke the Fifth Amendment right to remain silent during a civil immigration arrest. U.S. Const., amend. V; *see Kastigar v. United States*, 406 U.S. 441, 444–45 (1972) (noting that the privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," and that the "Court has been zealous to safeguard the values which underlie the privilege"). It is clearly established that the government cannot establish probable cause based on a person's silence pursuant to their Fifth Amendment rights. *See, e.g.*, *Hurd v. Terhune*, 619 F.3d 1080, 1088 (9th Cir. 2010) (affirming "the fundamental principle that a suspect's silence in the face of questioning cannot be used as evidence against him at trial").

38. If an immigration officer makes a warrantless arrest, at the time of an arrest and "as soon as it is practical and safe to do so," immigration officers must identify themselves as immigration officers

authorized to make arrests, inform the person arrested that they are under arrest, and state the reason for the arrest. 8 C.F.R. § 287.8(c)(2)(iii). The noncitizen must then "be taken without unnecessary delay for examination before an officer of the Service having authority to examine [noncitizens] as to their right to enter or remain in the United States." 8 U.S.C. § 1357(a)(2).

39. DHS is bound not only by statute and due process, but also by national policy regarding warrantless arrests adopted pursuant to settlement agreement in *Castañon Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 WL 3552757 (N.D. Ill. Nov. 13, 2025), *aff'd in part, rev'd in part sub nom. Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 175 F.4th 828 (7th Cir. 2026).

40. Under this policy, DHS must consider a delineated list of factors before making a warrantless immigration arrest, including (a) the officer's ability to determine the individual's identity; (b) knowledge of the individual's prior escapes or evasions of immigration authorities; (c) the individual's attempts to flee to avoid being discovered by immigration; and (d) the individual's ties to the community, such as a

family, home, or employment. Settlement Agreement, *Castañon Nava*, No. 18-cv-3757 (N.D. Ill. Feb. 7, 2022), Dkt. 155-1.[1]

41. The policy also requires DHS officers to "document the facts and circumstances surrounding [a] warrantless arrest in the narrative section of the [noncitizen's] I-213 as soon as practicable." *United Farm Workers v. Noem*, 829 F. Supp. 3d 801, 812 (E.D. Cal. 2026).

42. Federal immigration officers throughout the United States use administrative warrants to effectuate arrests, rather than judicial warrants that are supported by probable cause and approved by a neutral detached judicial officer. *See, e.g.*, *Garcia Lanza v. Noem*, 822 F. Supp. 3d 326, 332 (E.D.N.Y. 2026) ("[T]he officers resorted to the expedient of a Government form, an I-200 administrative arrest warrant, authorized for use by immigration enforcement officers only under carefully proscribed circumstances. Those circumstances are extremely limited due to the extraordinary nature of this process—it allows arresting officers to issue their own warrants—a rare exception to the traditional practices in

---

[1] *Available at*, https://immigrantjustice.org/sites/default/files/content-type/page/documents/202501/Nava_Settlement_ICE_Warrantless_Arrest-Vehicle_Stop_Policy_2021.pdf. This policy remains in effect at least until the district court fully resolves any pending motions in the case. *Castañon-Nava*, 175 F.4th at 835 n.5.

American law."); *Morelos Valdovinos v. Noem*, No. 26-cv-338, 2026 WL 948285, at *5 (D.N.M. Apr. 8, 2026) (noting that the government's "warrantless-arrest authorities are strictly limited, particularly in the interior-arrest context"), *report and recommendation adopted*, 2026 WL 2255156 (D.N.M. Aug. 5, 2026).

43. Post-arrest issuance of administrative warrants is "plainly invalid." *Garcia Lanza*, 822 F. Supp. 3d at 332; *see, e.g.*, *Gopie v. Lyons*, No. 25-cv-5229, 2025 WL 3167130, at *1 (E.D.N.Y. Nov. 13, 2025) (post-arrest issuance of administrative arrest warrant and NTA meant that "ICE arrested [plaintiff] when they had no authority to do so"); *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 853–54 (N.D. Ill. 2025) ("ICE lacked statutory and regulatory authority to engage in its policy of issuing I-200 warrants to collaterals in the field without the concurrent or prior issuance of an NTA."); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1226 (D. Colo. 2025) ("[I]ssuing *post hoc* warrants once plaintiffs had already been unlawfully arrested does nothing to cure the initial statutory violation."); *Maldonado v. Bostock*, No. 23-cv-760, 2023 WL 5804021, at *3 (W.D. Wash. Aug. 8, 2023) ("The parties provide no

authority for the proposition that DHS retains discretion to sidestep or override Section 1225 by issuing an NTA and arrest warrant.”).

44. Even when an officer develops and documents probable cause that a person is in the United States unlawfully and presents a flight risk, a person subject to a warrantless arrest must receive a custody determination within 48 hours, at which point DHS must issue a warrant and NTA in order to continue detaining the person. 8. C.F.R. § 287.3(d); *Marin v. Noem*, No. 25-cv-9343, 2025 WL 3158094, at *3 (C.D. Cal. Oct. 4, 2025) (“Under 8 C.F.R. § 287.3(c)–(d), following a warrantless arrest an officer must promptly advise the individual of the reasons for arrest and of the right to representation. Within 48 hours, the government must determine whether the person will remain in custody or be released on bond, and whether a [NTA] and warrant of arrest will issue.” (internal citations and quotations omitted)).

45. Failure to make the required determinations merits immediate release. *Matute Garcia v. LaRose*, No. 26-cv-4075, 2026 WL 2211804, at *2 (S.D. Cal. July 31, 2026) (holding violation of 8 C.F.R. 287.3(d) required immediate release from detention); *Quezada-Estrada v. Lyons*, No. 26-CV-1599, 2026 WL 1361880, at *6 (D. Colo. May 15, 2026)

(same); *Makuiza v. Wesling*, 826 F. Supp. 3d 176, 184 (D. Me. 2026) (same); *Alberto C.M. v. Noem*, 817 F. Supp. 3d 735, 740 (D. Minn. 2026) (same); *see also Gutierrez v. Knight*, No. 1:26-cv-469, 2026 WL 2676676 at *3 (D. Idaho Sept. 11, 2026) (ordering immediate release where petitioner was unlawfully detained for over two weeks before government conducted a custody determination and issued a warrant and NTA).

46. Violations of 287.3(d) merit immediate release even where officers had probable cause to suspect a person was a flight risk at the time of the arrest. *See Quezada-Estrada*, 2026 WL 1361880 at *5 ("Even if probable cause did exist, the nearly month-long delay between the arrest and warrant violates the 48-hour deadline imposed by DHS regulations . . . . To permit Respondents to flout these requirements and detain Petitioner by obtaining a warrant at their leisure would render such requirements dead letter."); *Makuiza,* 826 F. Supp. at 184.

## FACTUAL ALLEGATIONS

### I. Defendants' unlawful arrest and detention policies.

47. In 2018, Chicago residents and non-profit organizations sued DHS for its policy and practice of conducting warrantless arrests in the Chicago area without complying with the probable cause requirements in

Section 1357(a)(2). Second Amended Complaint, *Castañon Nava*, No. 18-cv-3757 (N.D. Ill. Dec. 18, 2018), Dkt. 58.

48. DHS reached a settlement agreement with the *Castañon Nava* plaintiffs that required the agency to adopt a nationwide policy to prohibit warrantless arrests that failed to meet the requirements of Section 1357(a)(2). On November 23, 2021, DHS issued a Broadcast Statement of Policy, which restates "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) and is to be interpreted consistent with all implementing regulations." Settlement Agreement, *Castañon Nava*, No. 1:18-cv-3735, Dkt. 155-1 at 17.

49. This policy makes clear that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*." *Id.* at 17–18. It also lists specific factors that may be relevant to determine likelihood of escape, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof, or other specific

circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond." *Id.* at 17.

50. On January 20, 2025, President Donald Trump issued executive orders and proclamations related to immigration, which set out a series of interior immigration enforcement actions. *See, e.g.*, Protecting the American People Against Invasion, Exec. Order No. 14159, 90 FR 8443 (Jan. 20, 2025); Guaranteeing the States Protection Against Invasion, Pres. Proc. No. 10888, 90 FR 8333 (Jan 20, 2025); *see also* Center for Migration Studies, *Summary of Executive Orders and Other Actions on Immigration*, Feb. 13, 2025.[2]

51. These sweeping changes to immigration enforcement policy established a formal framework for mass deportation. One executive order instructed DHS to "take all appropriate action to enable" ICE, CBP, and the United States Citizenship and Immigration Services ("USCIS") to prioritize civil immigration enforcement procedures, including through mass detention. *See* Protecting the American People Against Invasion, Exec. Order No. 14159, 90 FR 8443 (Jan. 20, 2025).

---

[2] *Available at* https://cmsny.org/publications/summary-executive-orders/.

52. In May 2025, the Government set an arrest quota of 3,000 immigrants per day for ICE and other federal agencies. José Olivares, *Trump administration sets quota to arrest 3,000 people a day in anti-immigration agenda*, The Guardian, May 29, 2025.[3]

53. On May 28, White House Deputy Chief of Staff Steven Miller confirmed that "[u]nder President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day." Rebecca Beitsch, *Trump administration seeking to triple immigrant arrests: Stephen Miller*, The Hill, May 29, 2025.[4]

54. To achieve these goals, agents were instructed to "turn the creativity knob up to 11" and aggressively "push the envelope" in arrests, including by pursuing "collaterals"—individuals who by definition would not have warrants. José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian, June 4, 2025.[5]

---

[3] *Available at* https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota/.
[4] *Available at* https://thehill.com/homenews/administration/5323491-stephen-miller-trump-triple-arrests-deportatoins/.
[5] *Available at* https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests/.

One email stated, "If it involves handcuffs on wrists, it's probably worth pursuing." *Id.*

55. In January 2026, Todd Lyons, Administrator of ICE, issued a memo setting forth factors purporting to satisfy the likelihood of escape requirement in Section 1357. *See Hussen v. Noem*, No. 26-cv-324 (D. Minn Jan. 30, 2026), Dkt. 85-1. But these factors are so broad that they apply to any person encountered on foot or in a vehicle.

56. To carry out the President's promise to conduct widespread immigration arrests and deportations, Defendants have a policy and practice, including in Montana, of making warrantless immigration arrests without probable cause that the person is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2).

57. Courts around the country have concluded that Defendants' arrest-first-ask-questions-later policy is unlawful. *See Vasquez Perdomo v. Mullin*, No. 25-cv-5605, 2026 WL 2751388, at *19 (C.D. Cal. Sept. 2, 2026) ("The Court therefore finds that Plaintiffs are likely to succeed in showing that the Government has engaged in a pattern, practice, and policy of conducting no escape risk analysis at all, relying solely on

unlawful status to determine escape risk, or basing the escape risk on false assertions."); *M-J-M-A-*, 822 F. Supp. 3d at 1178 ("The record is replete with examples demonstrating Defendants' pattern and practice of conducting warrantless arrests without first making the required individualized probable cause determinations."); *Escobar Molina*, 811 F. Supp. 3d at 49 (finding that "plaintiffs have established a substantial likelihood of an unlawful policy and practice by defendants of conducting warrantless civil immigration arrests without probable cause"); *Ramirez Ovando*, 810 F. Supp. 3d at 1234 ("[D]efendants likely have a pattern or practice of ignoring the individualized flight risk determinations mandated by [law]" and "have successfully shown that their cases are not isolated incidents, but part of a larger policy, pattern, or practice by ICE in this state." (emphasis omitted)).

58. This Court has also declared this policy and practice unlawful. *Hernandez v. Slaughter*, No. 26-cv-280, 2026 WL 2720390, at *3 (D. Mont. Sept. 15, 2026) (declaring warrantless arrests, in the absence of an individualized determination of flight risk, unlawful).

59. But Defendants continue to implement their unlawful policy. *See, e.g.*, *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d

22, 28 (D.D.C. 2026) (concluding Defendants were not complying with preliminary injunction); *Hernandez v. Slaughter, et al.*, No. 26-cv-280, 2026 WL 2720390, at *3 (D. Mont. Sept. 15, 2026) (declaring "the Government violates the Court's August 31, 2026 Order by continuing to detain class members who were arrested without a warrant or a pre-arrest individualized assessment for detention").

## II. Plaintiffs' have a pattern and practice of unlawful warrantless arrests in Montana.

60. On July 30, 2026, Jesus was driving in Lewistown, Montana. Two uniformed CBP agents stopped him.

61. The CBP agents arrested Jesus without a warrant and without probable cause that he was likely to escape before a warrant could be obtained. *Hernandez v. Crosson*, No. 26-cv-280, 2026 WL 2280918, at *5 (D. Mont. Aug. 7, 2026). This was a violation of due process and 8 U.S.C. § 1357.

62. Similarly, on August 3, 2026, Jose was passenger in a truck in Billings, Montana.

63. A Border Patrol agent was patrolling with the Montana Highway Patrol ("MHP") when the MHP trooper conducted a traffic stop

on Jose's truck, purportedly for failing to signal a lane change and lack of mud flaps.

64. During the traffic stop, the Border Patrol agent arrested Jose and the driver without a warrant and without probable cause that they were likely to escape before a warrant could be obtained. *See* Gov't's Resp. to Mot. for Ord. to Show Cause, *Martinez Alaniz v. Slaughter*, No. 26-cv-298 (D. Mont, Sept. 21, 2026), Dkt. 8 at 2 (conceding that Jose was arrested under "similar factual circumstances" as Jesus, "without a warrant being issued prior to the arrest" and without any documentation of an escape assessment).

65. Defendants did not perform a custody determination (I-286) for Jose or serve a warrant or NTA within 48 hours.

66. On September 3, 2026, after this Court's ruling on the illegality of warrantless arrests without the required safeguards, Lizet was driving to pick up her child from school in Billings, Montana.

67. CBP agents stopped Lizet and arrested her without a warrant and without probable cause that she was a flight risk. *Id.* (conceding that Lizet was also arrested under "similar factual circumstances" as Jesus,

"without a warrant being issued prior to the arrest" and without any documentation of an escape assessment).

68. Despite this Court's August 31 Declaration, Defendants refused to release Lizet. Instead, Lizet was forced to seek and obtain habeas relief. *See Martinez Alaniz v. Slaughter, et al.,* CV-26-298-BMM (Sept. 24, 2026), Dkt. 13, Order Granting Petition, 4–5 (concluding Government violated § 1357(a)(2)).

69. On September 2, 2026, DHS agents arrested Fredy in Havre, Montana.

70. At the time of arrest, DHS agents had not asked Fredy any questions related to his immigration status or community ties.

71. At the time of arrest DHS did not have probable cause that Fredy was in the United States in violation of immigration laws, or probable cause that Fredy was likely to escape before a warrant could be obtained for his arrest.

72. Since at least April 2025, Defendants have been illegally detaining noncitizens in Montana without adequate procedural safeguards.

73. In April 2025, CBP detained a Venezuelan national in Whitefish, Montana, after local law enforcement called CBP to the scene of a minor traffic violation. The individual was lawfully present in the United States and, at the time of his detention, was subject to an injunction precluding the federal government from terminating his protected status. The individual presented proof of lawful presence in the form of a valid Montana-issued REAL ID to the officers, but they arrested him anyway, and he spent a week in the Northwest Immigration and Customs Enforcement Processing Center in Tacoma, Washington, before DHS officers released him, unceremoniously, onto the street.

74. In October 2025, MHP stopped a driver on Interstate 15 near Rocker, Montana, and turned that individual over to CBP without charging him with any violation of Montana traffic laws. Although the driver was lawfully present in the United States, CBP first incarcerated him in a Montana county detention center and then relocated him to multiple federal detention facilities before finally releasing him. The driver spent over two months in detention.

75. In December 2025, CBP asserted that it arrested 41 individuals in violation of immigration laws in western Montana.[6] On information and belief, CBP arrested one or more of those individuals without a warrant and without individualized determinations of probable cause that they were in the United States unlawfully or that they posed a flight risk.

76. During the week of June 29, 2026, alone, DHS arrested as many as 100 individuals in the Gallatin County area.[7] One or more of those individuals was arrested without a warrant and without individualized determinations of probable cause that the persons were in the United States unlawfully or that the persons posed a flight risk.

77. Specifically, on June 29, 2026, DHS detained 20-year-old Bozeman resident Jose David Cortes Torres ("David"). ICE pulled David over while he was driving. *Torres v. Slaughter*, No. 26-cv-271, slip op. at 1–2 (D. Mont. July 7, 2026). ICE detained David in the ICE Helena Hold

---

[6] U.S. Customs and Border Protection, *U.S. Border Patrol operation achieves major enforcement success in western Montana* (Dec. 16, 2025) https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-operation-achieves-major-enforcement-success-western.

[7] Jenna Martin, *ICE raids Gallatin County sites, with as many as 100 detained*, Daily Montanan, July 4, 2026, https://dailymontanan.com/2026/07/04/ice-raids-gallatin-county-sites-with-as-many-as-100-detained/.

Room ("Helena Hold Room") at the Helena Regional Airport in Helena, Montana. *Id.* at 3. He shared a ten-by-twenty-foot space with approximately seventeen other people. *Id.*

78. DHS agents unlawfully detained David under a mandatory detention provision, 8 U.S.C. § 1225(b)(2)(A),[8] and thus did not obtain a warrant and did not conduct an individualized assessment of probable cause that David posed a flight risk, prior to arresting him.

79. In August 2026, DHS detained Adrian Espinoza De La Cruz and his nine-year-old daughter without a warrant and without an individualized determination of probable cause of flight risk. Sealed Document, *Espinoza De La Cruz v. Crosson*, 26-cv-289 (Aug. 19, 2026), Dkt. 7. This was a violation of due process and 8 U.S.C. § 1357. Order, *Espinoza De La Cruz v. Crosson*, 26-cv-289 (Aug. 19, 2026), Dkt. 13.

80. On August 31, 2026, this Court certified a warrantless arrest subclass of all "persons since July 25, 2026, who have been arrested or will be arrested in the District of Montana for alleged immigration

[8] The Ninth Circuit subsequently held DHS's practice of detaining individuals like David, who are present in the interior of the United States rather than seeking admission, under Section 1225(b)(2)(A) is unlawful. *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160 (9th Cir. 2026).

violations without a warrant and without a pre-arrest, individualized assessment of probable cause that that the person poses a flight risk." *Hernandez, v. Crosson*, No. 26-cv-280, 2026 WL 2568523, at *13 (D. Mont. Aug. 31, 2026).

81. This Court declared "the Government cannot detain putative class members if the detaining officer failed to obtain a warrant and did not conduct a pre-arrest, individualized assessment of probable cause that the person poses a flight risk." *Id.*

82. This Court further declared "the Class members are not subject to mandatory detention unless the Department of Homeland Security makes an initial custody determination under U.S.C. §§ 1226(c), 1225(b)(1), or 1231 subjecting an individual to mandatory detention." *Id.*

83. This Court also declared that the government violates the Constitution if it fails to comply with 8 U.S.C. § 1226 when making an initial arrest. *Id.*

84. Despite these binding declarations, the Government has continued its policy and practice of unlawful arrests and incarcerations in violation of the August 31 Order. *Hernandez v. Slaughter*, No. 26-cv-

280, 2026 WL 2720390, at *3 (D. Mont. Sept. 15, 2026) (finding the government to be in violation of the August 31 Court Order).

85. On September 18, 2026, the government admitted that 24 individuals detained without individualized assessments of flight risk presented "similar factual circumstances and legal questions as those already addressed by this Court in this matter and potentially other immigration habeas cases this Court has recently decided." Combined Response to Various Petitions, *Hernandez v. Slaughter*, No. 26-cv-280, (D. Mont. Sept. 18, 2026), Dkt. 93 at 2–3; *see also Espinoza De La Cruz v. Crosson*, 26-cv-289; *Cortes Torres v. Slaughter*, 26-cv-271; *Orozco Ramirez v. Visser*, 26-cv-252.

86. That same day, the *Hernandez* Court issued Orders granting individual habeas relief to all 24 individuals arrested pursuant to the government's unlawful policy and practice of warrantless arrests without an individualized determination of probable cause of flight risk.

87. Since then, this Court has issued ten more orders granting individual habeas relief to five additional class members and five non-class members, including Lizet and Jose, all of whom were arrested

pursuant to the government's unlawful policy and practice of warrantless arrests without an individualized flight risk determination.

88. Absent class-wide injunctive relief, DHS will continue to engage in its policy and practice of conducting unlawful warrantless arrests, forcing detained individuals, the Court, and the government to engage in an unceasing cycle of habeas relief.

## CLASS ALLEGATIONS

89. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Jesus, Jose, Lizet, and Fredy bring this action on behalf of themselves and all other persons who are similarly situated.

90. A class action is proper because this action involves questions of law and fact common to the class; the class is so numerous that joinder of all members is impractical; the claims of the Plaintiffs are typical of the claims of the class; Plaintiffs will fairly and adequately protect the interests of the class; and Defendants have acted on grounds that apply generally to the class, so that final declaratory relief is appropriate with respect to the class as a whole

91. Plaintiffs seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

WARRANTLESS ARREST CLASS: All persons since July 30, 2026 who are present in the interior of the United States and have been arrested or will be arrested in the District of Montana for alleged immigration violations without a warrant.

92. Plaintiffs seek to represent subclasses:

NO PROBABLE CAUSE OF ILLEGAL PRESENCE SUBCLASS: All persons since July 30, 2026 who are present in the interior of the United States and have been arrested or will be arrested in the District of Montana for alleged immigration violations without a warrant and without probable cause of illegal presence.

UNASSESSED ESCAPE RISK SUBCLASS: All persons since July 30, 2026 who are present in the interior of the United States and have been arrested or will be arrested in the District of Montana for alleged immigration violations without a warrant and without a documented pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

8 C.F.R. § 287.3(d) VIOLATIONS SUBCLASS: All persons since July 30, 2026 who are present in the interior of the United States and have been arrested or will be arrested in the District of Montana for alleged immigration violations without a warrant who do not receive a custody determination or are not issued a warrant and Notice to Appear within 48 hours of their arrest.

93. The class is so numerous that joinder of all members is impracticable. An estimated 6,000 Montanans lack immigration status.[9]

[9] Migration Policy Institute, *State and County Estimates of Unauthorized Immigrants* (2023), https://www.migrationpolicy.org/data-tool/unauthorized-immigrants/mt

Moreover, joinder is particularly impractical since the classes include future members, and many members do not have access to counsel.

94. Defendants are uniquely positioned to identify the total number of persons arrested. On information and belief, DHS detains hundreds of individuals each year in Montana. During the week of June 29, 2026, alone, DHS arrested as many as 100 individuals in the Gallatin County area, including one or more individuals arrested without a warrant.[10] And since July 2026, DHS has arrested at least 37 individuals in Montana who were granted habeas release based on violations of Section 1357. The class is also comprised of many future members.

95. Since January 1, 2025, ICE has arrested at least 300 individuals in Montana. This does not include CBP information because, on information and belief, CBP does not provide Montana-specific information publicly.

96. The proposed class meets the commonality requirement of Federal Rule of Civil Procedure 23(a)(2). All class members present the same questions of law and fact, including:

---

[10] Jenna Martin, *ICE raids Gallatin County sites, with as many as 100 detained*, Daily Montanan, July 4, 2026, https://dailymontanan.com/2026/07/04/ice-raids-gallatin-county-sites-with-as-many-as-100-detained/.

a. Whether DHS has a policy, pattern, or practice of conducting warrantless arrests without proper probable cause that an individual is in the country unlawfully.

b. Whether DHS has a policy, pattern, or practice of conducting warrantless arrests without proper probable cause that an individual likely to escape before a warrant can be obtained for the arrest;

c. Whether DHS's policy, pattern, or practice of conducting warrantless arrests without proper probable cause violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)–(ii).

d. Whether DHS has a policy, pattern, or practice of detaining people subject to warrantless arrests without providing them a custody determination and issuing a warrant and NTA within 48 hours

e. Whether DHS's policy, pattern, or practice of conducting warrantless arrests without proper probable cause violates 8 C.F.R. § 287.3(d).

97. Named Plaintiffs' claims are typical of the class, as they face the same injury and assert the same claims and rights as the class.

98. The proposed class meets the adequacy requirement. The named Plaintiffs seek a declaration of rights and injunctive relief applicable to the whole class, are represented by competent class counsel, and will fairly and adequately protect the class's interest.

99. There are questions of law and fact that are common to the class which predominate over any individual questions. Further, Defendants have acted, or refused to act, on grounds generally applicable to the class, making appropriate final injunctive and declaratory relief, with respect to the class as a whole.

100. Like in *Hernandez*, the proposed class meets Rule 23 criteria. Plaintiffs have standing because each Plaintiff was subject to Defendants' unlawful actions. Although Jesus, Lizet, and Jose have already obtained individual habeas relief, Fredy remains in detention as of the filing of this action. Even if Fredy obtains habeas relief before class certification, the class action will remain live. *Hernandez v. Crosson*, No. 26-cv-280, 2026 WL 2568523, at *16 (D. Mont. Aug. 31, 2026); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) ("That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction.").

101. Moreover, even individuals who have secured release from an illegal warrantless arrest have standing. *See M-J-M-A-*, 822 F. Supp. 3d at 1175 (concluding released individuals had standing because "Plaintiffs' daily exposure to Defendants' immigration enforcement practices employing warrantless arrests without conducting a pre-arrest assessment of someone's likelihood of escape causes significant ongoing harm"); *Vasquez Perdomo v. Noem*, 148 F.4th 656, 675 (9th Cir. 2025) (concluding released individuals continued to be injured by illegal stop policy because "[t]here is no predicate action that the individual plaintiffs would need to take, other than simply going about their lives, to potentially be subject to the challenged stop").

102. Indeed, "[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980); *see, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (class representative was no longer in pre-trial custody when class challenging pre-trial detention was certified); *Chief Goes Out v. Missoula Cnty.*, No. 12-cv-155-M-DWM, 2013 WL 139938, at *6 (D. Mont. Jan. 10, 2013) ("An inmate may

adequately represent a class that includes future inmates, even if the inmate is released or transferred."); *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1120 (N.D. Cal. 2025) (liberated class representatives had standing to challenge short-term immigration detention facility conditions).

103. Plaintiffs seek to represent a class of individuals who are detained by DHS officials and subsequently incarcerated in short-term detention facilities within the District of Montana, including the Cascade County Detention Center and various CBP facilities, before being transported out of the District for parts unknown. This transitory population is the type *Gerstein* and its progeny certified. Plaintiffs have standing to represent the putative class.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the Administrative Procedure Act (5 U.S.C. § 706(2))**
**Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i)–(ii)**
**Policy and Practice of Warrantless Arrest Without Individualized Assessment of Flight Risk**

104. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

105. Defendants have a policy and practice of making warrantless arrests in Montana without making individualized determinations of

flight risk as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)–(ii).

106. This policy and practice is a final agency action that is arbitrary, capricious, not in accordance with law, contrary to a constitutional right, and in excess of statutory jurisdiction, authority, or limitations.

107. This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" Defendants' policy through vacatur of the final agency action. 5 U.S.C. § 706(2).

108. This Court also has inherent equitable authority to enjoin violations of federal law by federal officers. See *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

109. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Unassessed Risk Class are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued irreparable injury.

110. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

111. Defendants have a policy and practice of making warrantless arrests in Montana without probable cause of immigration status as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)–(ii).

112. This policy and practice is a final agency action that is arbitrary, capricious; not in accordance with law; contrary to a constitutional right; in excess of statutory jurisdiction, authority, or limitations; and without observation of process required by law.

113. This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" Defendants' policy through vacatur of the final agency action. 5 U.S.C. § 706(2).

114. This Court also has inherent equitable authority to enjoin violations of federal law by federal officers. See *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

115. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Unassessed Risk Class are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued irreparable injury.

## COUNT III
## Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)) Violation of 8 C.F.R. § 287.3(d) Policy and Practice of Denying Custody Determinations and Failing to Serve Warrants and Notices to Appear

116. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

117. Defendants have a policy and practice of detaining individuals arrested without a warrant for more than 48 hours without providing a custody determination or serving a warrant and NTA, as required under 8.C.F.R. § 287.3(d).

118. This policy and practice is a final agency action that is arbitrary, capricious; not in accordance with law; contrary to a constitutional right; in excess of statutory jurisdiction, authority, or limitations; and without observation of process required by law.

119. This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" Defendants' policy through vacatur of the final agency action. 5 U.S.C. § 706(2).

120. This Court also has inherent equitable authority to enjoin federal officers' violations of federal law. See *Armstrong*, 575 U.S. at 326.

121. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed 287.3(d) Violations Class are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued irreparable injury.

## COUNT IV
## Violation of the *Accardi* doctrine Policy and Practice of Violating *Nava* Broadcast Policy on Warrantless Arrests and Vehicle Stops

122. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

123. DHS is bound by the *Nava* Broadcast Policy, pursuant to the *Castañon Nava* settlement agreement, to consider a delineated set of factors before effectuating a warrantless arrest. In particular, before concluding whether or not the person is at risk of fleeing before a warrant is obtained, DHS agents must consider "the totality of circumstances," including the following factors: (1) "ability to determine the individual's identity," (2) "knowledge of that individual's prior escapes or evasions of immigration authorities," (3) "attempted flight",(4) "ties to the community (such as a family, home, or employment) or lack thereof," or (5) "other specific circumstances that weigh in favor or against a

reasonable belief that the subject is likely to abscond." Settlement Agreement, *Castañon Nava*, No. 18-cv 3757, (N.D. Ill. Feb. 7, 2022), Dkt. 155-1, 17–18.

124. Defendants' policy and practice of making warrantless arrests in Montana without individualized determinations about a person's flight risk as required by law violates the *Nava* Broadcast Policy. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

125. Thus, Defendants' violation of the *Nava* Broadcast Policy violates the APA. *See Alcaraz*, 384 F.3d at 1162 (collecting cases and noting that the "*Accardi* doctrine extends beyond formal regulations," to include published and internal policies and procedures, policy statements, and evidence of an agency's "usual practice"); *see also M-J-M-A- v. Hermosillo*, No. 25-cv-2011, 2026 WL 2575511, at *6 (D. Or. Aug. 31, 2026) (concluding plaintiffs had sufficiently stated an *Accardi* claim based on the *Nava* Broadcast Policy).

126. Defendants' policy and practice of making warrantless arrests in Montana in violation of the *Nava* Broadcast Policy is a final agency action that is arbitrary, capricious; not in accordance with law; contrary to a constitutional right; in excess of statutory jurisdiction, authority, or limitations; and without observation of process required by law.

**PRAYER FOR RELIEF**

WHEREFORE,

A. Plaintiffs respectfully request that this Court:

1. Assume jurisdiction over this matter;

2. Certify this case as a class action, and certify the class;

3. Appoint Named Plaintiffs Jesus Verde Hernandez, Jose Alfredo Martinez Alaniz, and Lizet Holguín Vega as representatives of the class;

4. Appoint undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g).

B. As remedies for each of the causes of action asserted above, Plaintiffs and proposed class members request that this Court:

a. Declare that Defendants' policy and practice of making warrantless immigration arrests without making a pre-arrest,

individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses an escape risk violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2);

b. Issue a preliminary and permanent order enjoining Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of both an immigration law violation and escape risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287(c)(2)(i)–(ii); and

c. Vacate and set aside Defendants' policy of making warrantless immigration arrests without an individualized determination of both an immigration law violation and escape risk, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)–(ii).

d. Declare that Defendants' policy and practice of detaining individuals without a custody determination and without serving a warrant and NTA within 48 hours violates 8 C.F.R. § 287.3(d).

C. Plaintiffs further request that this Court award reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act and on any other basis justified under law; and

D. Grant any further relief as this Court deems just and proper.

Dated: September 25, 2026,

Respectfully Submitted,

*/s/ Andres Haladay*

Andres Haladay
Molly E. Danahy
Caitlin M. Cocilova
Jonathan M. Molony
Upper Seven Law
P.O. Box 31
Helena, MT 59624
(406) 998-6067

*Attorneys for Plaintiffs*